UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 23 CR 113-6 |
| v. | |
| HADER GARCIA | Chief Judge Virginia M. Kendall |

## GOVERNMENT'S SENTENCING POSITION PAPER

Defendant Hader Garcia pled guilty to conspiracy to possess with intent to distribute and distribute cocaine base, cocaine, and heroin. The government anticipates asking the Court to impose a below-Guidelines term of imprisonment within the 30 to 37 month range, followed by a three-year term of supervised release. As explained below, such a sentence is warranted because of the seriousness of the offense, defendant's history and characteristics, and the need to provide both specific and general deterrence.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Beginning no later than on or about December 10, 2021, and continuing until on or about February 17, 2022—when he was arrested on state murder charges—defendant conspired with his co-defendants and others to distribute controlled substances, specifically crack cocaine, cocaine, and heroin to customers on the north side of Chicago. This narcotics-trafficking conspiracy involved a drug trafficking organization operated by co-defendants Eduart Hoxha, Karina Jimenez, Alexis Del Toro, Freddy Del Toro, and Bryan Del Toro (the "Del Toro DTO"). The Del Toro DTO and its members were affiliated with La Familia Stones street gang. After obtaining cocaine base from Hoxha, other Del Toro DTO members, including

defendant, would generally package, or cause others to package, cocaine base for distribution to customers.

The Del Toro DTO used telephone number (312) XXX-9994 (the "DTO Phone") as a call-up drug delivery phone line to distribute narcotics to customers. Del Toro DTO customers would primarily call the DTO Phone to order drugs, mainly cocaine base. After an order for cocaine base was placed, the member of the Del Toro DTO in possession of the DTO Phone—generally Freddy Del Toro, Alexis Del Toro, or Bryan Del Toro, but at times defendant—would then coordinate the distribution of cocaine base to customers by, for example, personally delivering the cocaine base to customers or directing street-level traffickers to deliver the cocaine base to customers. Defendant was a prolific distributor for the Del Toro DTO. Over the course of the charged conspiracy, defendant made eight deliveries to undercover officers and was present for an additional distribution by Alexis Del Toro.

At times, Del Toro DTO members, including defendant, were armed with firearms when trafficking drugs. For example, as described in greater detail below, defendant possessed a firearm during a January 21, 2022 narcotics transaction in which defendant sold approximately 1.5 grams of cocaine to an individual who, unbeknownst to defendant, was an undercover law enforcement officer ("UC-2") posing as a DTO customer.

Between approximately December 10, 2021, and February 17, 2022, members of the DEL Toro DTO distributed, on average, approximately 4.29 grams of cocaine base each day to narcotics customers. Between approximately December 10, 2021,

2

and February 17, 2022, the total amount of controlled substances involved in the conspiracy, which was reasonably foreseeable to him and for which he is accountable, was approximately 300 grams of cocaine base and approximately 3.3 grams of cocaine. Defendant is also accountable for .4 grams of heroin that he sold to UC-3 on February 1, 2022.

On January 9, 2024, a grand jury returned a superseding indictment charging defendant with conspiracy to possess with intent to distribute and distribute a controlled substance, namely, a quantity of cocaine base, a quantity of cocaine, and a quantity of heroin, in violation of Title 21, United States Code, Sections 846 (Count 1); distribution of a controlled substance, namely, a quantity of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) (Count 4); distribution of a controlled substance, namely, a quantity of cocaine and a quantity of heroin, in violation of Title 21, United States Code, Section 841(a)(1) (Count 5); and distribution of a controlled substance, namely, a quantity of cocaine base, in violation of Title 21, United States Code, Section 841(a)(1) (Count 6). R. 261. On July 9, 2024, defendant pleaded guilty to Count One pursuant to a plea agreement. R. 377.

Below are examples of defendant's role in the charged drug-trafficking conspiracy. The three distributions described below are illustrative of defendant's role in the conspiracy and constitute relevant conduct, but represent only a portion of defendant's narcotics distribution during the course of the conspiracy. During the investigation, undercover law enforcement officers purchased narcotics from

3

defendant on eight total occasions, and defendant admitted to Probation that he supported himself financially by selling drugs. PSR ¶ 74.

***On January 21, 2022, Defendant Distributed Approximately 1.5 Grams of Cocaine to UC-2 and Possessed an Apparent Firearm***

On January 21, 2022, UC-2 placed a recorded phone call to the DTO Phone, which defendant answered. UC-2 inquired with defendant about purchasing narcotics. Defendant directed UC-2 to a gas station near the intersection of Lawerence Avenue and Kildare Avenue in Chicago, Illinois. UC-2 traveled there and located defendant. Defendant was in the driver's seat of his vehicle with a female in the passenger seat passenger. UC-2 covertly recorded audio and video of the transaction. UC-2 handed $200 to the female passenger, who handed the money to defendant. Defendant counted the money and began to sort through several clear knotted bags that contained a white, rock-like substance that were inside a larger bag. Defendant handed UC-2 six clear knotted bags that contained a rock-like substance.

During the transaction, UC-2 observed an object that appeared to be a two-toned semi-automatic handgun on defendant's lap. A still image from the video that UC-2 covertly recorded is below:



The Illinois State Police laboratory determined that the content of the six clear knotted bags contained approximately 1.5 grams of a substance containing cocaine.

***On February 1, 2022, Defendant Distributed Approximately 1.8 Grams of Cocaine and .4 Grams of Heroin to UC-2 and UC-3***

On February 1, 2022, UC-2 placed a recorded call to the DTO Phone. Defendant answered. UC-2 inquired regarding purchasing narcotics, indicating that UC-2 wanted to purchase "300 [$300 worth of cocaine]."[1] Defendant instructed UC-2 to meet him in an alley near the intersection of Central Park Avenue and Lawrence

---

[1] Some lawfully recorded or intercepted conversations ("recorded conversations"), including some translated from Spanish, have been summarized in this memorandum. The language that is quoted from the recorded conversations is based draft, not final, transcripts of the recorded conversations. The times listed for the recorded conversations are approximate and, unless otherwise indicated, reflect the time in the North American Central Time Zone. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points the government has included in brackets interpretation of words and phrases used in the recorded conversations. The interpretations are based on information received from the contents and context of the recorded conversations, events that took place before and after the conversations, law enforcement's knowledge of the investigation as a whole, the experience and training, and the experience and training of law enforcement agents in the investigation.

Avenue in Chicago. UC-2 traveled to that location with another law enforcement officer who was also acting in an undercover capacity ("UC-3"). As UC-2 and UC-3 neared the location, UC-2 placed another call to the DTO Phone. Defendant again answered and instructed UC-2 to turn into an alley south of Lawrence on Central Park. Defendant was in a black Buick SUV parked on the 4700 block of Central Park, near defendant's residence on the same block.

Defendant approached the front passenger window of the vehicle in which UC-2 and UC-3 were driving. UC-2 asked if defendant had "D [heroin]." Defendant did not immediately respond, instead turning his attention to UC-3 and asking what UC-3 needed and how much money UC-3 intended to spend. UC-3 requested $50 worth of "D [heroin]." Defendant said he would need to go inside to check if he was in possession of the requested narcotics. UC-2 then handed defendant $300. In exchange, defendant gave UC-2 eleven clear knotted plastic bags that contained a rock-like substance.

Defendant then left the vehicle in which UC-2 and UC-3 were driving and entered his residence. After entering the residence, defendant called UC-2 and asked if UC-3 would mind purchasing "raw [uncut heroin]." After ending the call, defendant returned to the front passenger window of the vehicle. Defendant handed UC-3 a knotted plastic bag that contained a tan rock-like substance. In return, UC-3 handed defendant $300.

Defendant asked UC-2 and UC-3 not to tell "Tony"—by which he meant Alexis Del Toro—that he had sold heroin to UC-3.

6

The Illinois State Police laboratory determined that the contents of the eleven clear knotted plastic baggies defendant sold to UC-2 weighed approximately 1.8 grams and contained cocaine. It also determined that the contents of the clear knotted plastic baggie that contained a tan rock-like substance weighed .4 grams and contained heroin.

### On February 8, 2022, Defendant Distributed Approximately 4.43 Grams of Cocaine Base to UC-1 and UC-4

On or about February 8, 2022, a law enforcement officer working in an undercover capacity ("UC-1") placed a recorded call to the DTO Phone. Defendant answered. UC-1 requested "C [cocaine base]" and "D [heroin]." Defendant responded that he did not have "D." Defendant told UC-1 to meet him in the area of Lawerence Avenue and Central Park Avenue in Chicago. Defendant also asked UC-1 whether he "like[d] Xanax." Defendant indicated that he could sell "white sand [cocaine]" and "percs [Percocet, a pain medication containing Oxycodone]."

Later that morning, UC-1 placed another recorded call to the DTO Phone and again spoke to defendant about the potential transaction. Defendant provided UC-1 directions to defendant's residence on the 4700 block of North Central Park Avenue in Chicago. Defendant also asked UC-1, "What you say you needed?" UC-1 indicated that he wanted one Percocet pill and six "50s," or bags containing $50 worth of cocaine base. Defendant and UC-1 agreed to meet near defendant's residence to complete the transaction.

At approximately 9:52 a.m., defendant met with UC-1 and another law enforcement officer acting an undercover capacity ("UC-4") near defendant's

7

residence on the 4700 block of North Central Park Avenue. The meeting was audio and video recorded. During the meeting, UC-1 stated, "How much do I owe you for those [narcotics] man?" Defendant stated, "$300 for this [cocaine base] . . . and $100 for this [Oxycodone]." Defendant gave UC-1 nine clear plastic baggies containing cocaine base. UC-1 gave defendant with $300.

UC-1 then stated to UC-4, "All right man, give him [defendant] your money [for the Oxycodone], man" UC-4 then handed $120 to defendant, and defendant handed a pill to UC-4.[2]

During the transaction, UC-1 stated to defendant, "Can you plug him in wit you [connect UC-4 with GARCIA for future narcotics transactions]?" Defendant stated, "Hell ya . . . give him [UC-4] my number." After UC-4 received the pill from defendant and handed defendant $120, defendant asked, "Why you gonna need some change [for the $120 that was provided for the $110 deal]?" UC-4 responded, "Yeah, man. Listen . . . any way you can hook me up [provide me] with . . . ." Defendant stated, "Oh you want some of this shit [cocaine base] too . . . I got some [cocaine base], what you want [how much cocaine base does UC-4 want]?" UC-4 responded, "Fuck it, if you could get, 80 [$80] 100 [$100] right here, I'll grab [purchase] it man . . . 100 C [$100 dollars' worth of cocaine base]." During this transaction, UC-4 handed defendant an additional $90 in pre-recorded government funds for the cocaine base.

---

[2] A video recording of the transaction captured UC-4 counting money; however, based upon the angle of the camera, the recording did not capture UC-4 hand the money to defendant. According to UC-4, he provided the money for the narcotics to defendant.

Defendant stated, "1, 2, 3, 4, 5 [counting five $20 baggies of cocaine base], ya, I'mma hook you up [provide cocaine base to you]. I was waiting on someone [a narcotics customer] to pull up [arrive] and grab [purchase] this [cocaine base] but I'll fuck wit you [sell it to you], fuck it. Here you go my brother." Defendant handed five clear plastic baggies containing cocaine base to UC-4. UC-1 stated, "Can you sell me some more [cocaine base] or do you have to sell to somebody else [another narcotics customer]?" Defendant replied, "Man, honestly, I've got to sell . . . I've got to sell [cocaine base] to somebody else. See, I will call you back in thirty minutes, alright. Look, I'mma call you back in thirty minutes, I'mma probably get some more [cocaine base]."

Later in the meeting, UC-4 stated, "If these [cocaine base and Oxycodone] are good man you mind locking my number in [saving UC-4's number on the DTO Phone for future narcotic transactions]?"[3] Defendant responded, "Take it right now, trust me you're gonna love it. I'm gonna give you my personal number 'cause on this number [Target Phone 1] I usually sell C [cocaine], you know. On my personal number I got you on that stuff [prescription narcotics]. 773-[***]-8400. Lock me in [save defendant's telephone number on UC-4's telephone] as 'Luis.' Just text me and be like 'yo this is Scotty' alright." Defendant then stated, "Hey look, I'm gonna see a couple people [distribute narcotics to narcotics customers] and I'm gonna see what

---

[3] Del Toro DTO members saved the telephone numbers of narcotics customers in the DTO Phone.

[narcotics] I got left [after distributing narcotics to narcotics customers] and I got [can distribute additional narcotics to UC-4] you alright."

The substances that defendant distributed to UC-1 and UC-4 were submitted to the DEA North Central laboratory for testing. Laboratory testing concluded that the contents of the 14 baggies weighed approximately 4.43 grams and contained cocaine base. Laboratory testing also concluded that the pill weighed approximately .266 grams and contained Oxycodone.

### *Defendant was Charged with Two Murders that Allegedly Occurred During the Conspiracy*

On Mach 16, 2022, a Cook County grand jury indicted defendant on charges of first degree murder and several lesser included offenses. *See* Cook County Case No. 22 CR 0309901. The indictment alleged that defendant shot and killed Richard Robinette on December 18, 2021, in Chicago. On June 7, 2022, a Cook County grand jury indicted defendant on additional charges of first degree murder and several lesser included offenses. *See* Cook County Case No. 22 CR 0624301. The indictment alleged that defendant shot and killed Victor Gutierrez in Chicago on December 11, 2021. Both cases remain pending as of the date of this filing.

The government does not have evidence connecting these charges to the narcotics trafficking conspiracy to which defendant pled guilty. It is nonetheless aggravating that these murders are alleged to have occurred at the same time defendant was a member of the Del Toro DTO.

10

***After his Arrest on Murder Charges, Defendant Stayed in Contact with Freddy Del Toro Regarding the Del Toro DTO and Narcotics Distribution***

Defendant was arrested on February 17, 2022 and has been in custody since that date. Though he did not distribute additional narcotics after that date, defendant stayed in frequent contact with Freddy Del Toro, a leader of the Del Toro DTO, regarding the operation of the Del Toro DTO. The calls are aggravating because their content and tone show that defendant was a trusted member of the Del Toro DTO with intimate knowledge of the scope of its operations.

For example, Freddy Del Toro and defendant had the following conversation regarding Freddy Del Toro's perception that law enforcement was investigating the Del Toro DTO on November 5, 2022: [4]

GARCIA: Yo.
Freddy: My bad, moe.[5] These fucking narcs really behind me. I'm like, "Fuck." On stone [swearing on the La Familia Stones street gang] they been really hot lately.
GARCIA: Yeah?

---

[4] As part of the investigation, law enforcement officials obtained authorization to intercept wire and electronic communications to and from the DTO Phone, or Target Phone 1, over three separate 30-day periods. Specifically:

- On or about June 22, 2022, the Honorable Rebecca R. Pallmeyer, Chief Judge for the Northern District of Illinois, entered an order authorizing the initial interception of wire and electronic communications to and from Target Phone 1.

- On or about August 23, 2022, Chief Judge Pallmeyer entered an order authorizing the renewed interception of wire and electronic communications to and from Target Phone 1.

- On or about October 7, 2022, Chief Judge Pallmeyer entered an order authorizing the renewed interception of wire and electronic communications to and from Target Phone 1.

[5] Members of the La Familia Stones street gang at times refer to each other as "Law" or "Moe" and that the term "Moe" is an acronym for "Men on Earth."

| | |
|---|---|
| Freddy: | Yeah, moe, on stone. And then, Finn [co-defendant Eduart Hoxha] is talking about, you know, one of them people, moe, the fucking 12 where he's at over there at his house, with the fucking store. |
| GARCIA: | Yeah. |
| Freddy: | He said the dude was looking at the camera, and there's a police parked everywhere, in every corner, moe. I guess they were looking for this nigga, moe, on stone. Or they were watching him, moe. |
| GARCIA: | For who? For Finn? |
| Freddy: | Yeah, they're watching him or some shit, moe. |
| GARCIA: | Nah. |
| Freddy: | Yeah. |
| GARCIA: | They're on his ass. |
| Freddy: | On stone they are on his ass, moe. Shit. I'm shitting bricks, too, moe. 'Cause my brother is talking about 12 chased fucking pickup truck. Right, moe? A pickup truck and 2 cars got on his ass, moe. I'm like, "What the fuck? A pickup truck? That's the Marshals or some shit." |
| GARCIA: | Damn. |
| Freddy: | And for no reason, though, moe. For no reason, they were at the gas station, and that's it. And then, other day, moe, on stone. They were the blue boys and then the narcs were behind, you know, the blue boys and then on stone they were chasing him for a long time. He said that he ended by O'Hare and shit. I don't know, I think the police are doing an operation for Cadillac/Catalytic converter, and they think that the car that my brother has... they think it's one of them, you know? But it's not. |

Additionally, Freddy Del Toro and defendant had the following two conversations on October 12 and November 11, 2022 regarding the importation and distribution of narcotics and the operation of the Del Toro DTO:

| | |
|---|---|
| Freddy: | Damn you reminded me. I got to go get that [U/I] from Tiny. I can get that 6 [U/I]. Call that lady's number. |
| GARCIA: | You all got to get them 60's again, man. |
| Freddy: | We're trying Moe. I got the number I think. I just got to get Tiny's phone, you know, like his line so I can call the bitch. And be like, "Look, it's me. I need them. You know." Cause I tried calling her from my number but she wasn't going, Moe. |
| GARCIA: | Oh, Moe paying like 20 bucks a pop. |
| Freddy: | Man, you know how much money we can make on that shit. |
| GARCIA: | Moe will give her 2 bands and he'll get a whole trash bag full of Moe [U/I]. |

12

| | |
|---|---|
| Freddy: | Damn, look at that shit. I'll get a new car by the end of the year if I could get associate like that. |
| GARCIA: | Just you selling them $60 a pill that's already a lot of money. |
| Freddy: | You know you making double, triple. If you selling by 100 bucks more, imagine that. Damn! |
| GARCIA: | I ain't gonna lie. If you get them bitches, you got to sell them bitches for 100. The least if you fuck with a nigga, $80. That's only if they buying alot. |
| Freddy: | Exactly. |
| GARCIA: | You be showing too much love. |
| Freddy: | 110 bucks, shit. But you know how much money... |
| GARCIA: | If a nigga had Stacys [u/i] right now, he'll charge you 100 or 120. He ain't gonna look out for you. |
| Freddy: | No, you right. |
| GARCIA: | They don't care about nobody. They just want to make some money. And, you can't do nothing but buy 'cause don't nobody else got them bitches, so they're rare. |
| Freddy: | Yep, exactly. They rare as fuck. |
| GARCIA: | The least you can sell them bitches for is $80 and that's in bulk. 75 bulk the least. Anything else, if you buying 5 and up $90. |
| Freddy: | Damn. So that's money right there. Shit. |
| GARCIA: | You can make 2 bands off this. I made alot of money just selling percs. |
| Freddy: | Imagine the 30's too. They be going crazy. |
| GARCIA: | That's why I'm saying. That's why you sell the 60's for 100. Cause the 30s already go 50, 45 bucks. |
| Freddy: | Yeah. Right. |
| GARCIA: | Hell yeah. Ain't no nigga gonna give you perc 30 for already go for |
| GARCIA: | That's why I was selling my shit for 120, 110, 90 at the least. And they just bought it like 4, 5 of them bitches. Then, I used to look to her for 90 bucks. She's buying like 4, 5 of them bitches. She giving me like 500 bucks, 5 percs. |
| Freddy: | Damn. She was going crazy, huh? Damn. |
| GARCIA: | I'm selling it to the LB's for 100, 110. |
| Freddy: | Damn, that girl is for real. They were going crazy for that huh? |
| GARCIA: | I'm selling them lines, lines of Trish for 200. |
| Freddy: | Damn. Where you getting that from? |
| GARCIA: | I'm getting my Trish from that dish right there on Keystone Collar [PH]. |
| Freddy: | I don't know. I was getting... I get the green one. They don't got the purple shit. They said they got the purple. |
| GARCIA: | The little white bitch got it. Not the black bitch. The white bitch. |
| Freddy: | Right. Exactly. She can't get it though. |

13

| | |
|---|---|
| GARCIA: | Look, tell her like this. "My brother Luis said you used to get the purple stuff. What happened? Why you getting the green stuff now?" |
| Freddy: | Oh shit. |
| GARCIA: | She used to get the purple and then the black bitch used to get the green. I be getting both. I'm giving her a nifty for 4 lines. |
| Freddy: | That's what I'm doing. But I'm looking for... not the green. |
| GARCIA: | No, I'm saying for the purple shit. I'm giving her a 50 for 4 lines. 4 ounces, she'll give me a little bottle, a 4oz bottle. I'll give her a 50. I'll sell 2 lines. I'll make 400 bucks. I made 10 times more what I paid and then I drink 2 lines. |
| Freddy: | Damn! What the fuck. I didn't know she had it. |

This November 11, 2022 conversation appears to be related to the same topics as the October 12, 2022 conversation quoted above.

| | |
|---|---|
| Freddy: | I said I'm happy as hell moe, I found the lady with the percs. Moe on stone. |
| GARCIA: | That you finna pop a pill? |
| Freddy: | No, I said that I found the lady with the 60s. |
| GARCIA: | Yeah, with the 60s? |
| Freddy: | On stone. I found her moe. |
| GARCIA: | You got 'em? |
| Freddy: | No, she's gonna call me in 2 weeks. That they're coming from Germany right now. |
| GARCIA: | She's coming from Germany? |
| Freddy: | On stone. |
| GARCIA: | Damn, I knew she got them bitches from Germany. |
| Freddy: | On stone. |
| GARCIA: | Them bitches are real German pills moe. |
| Freddy: | On stone moe, she said she coming from Germany and I'm like, "Damn!" |
| GARCIA: | On stone moe. When you get 'em moe, don't fuck the mark-up up, moe. On stone, you're the only nigga in Chicago with these bitches. On stone, you gotta sell them... |
| Freddy: | I'm already knowing that moe. |
| GARCIA: | On stone moe, you gotta sell these bitches for 100 a pill, moe. 120 the most, on stone. If you know a nigga got it, 120. On stone. 100 a pill. On stone. If you buy 5 or more pills, you do them for 90 bucks, on stone. |
| Freddy: | On stone. |
| GARCIA: | On stone moe, that's how you gotta do 'em these niggas don't play. On stone, they be taxing with the percs, you gotta tax with the percs too. |

Freddy: I already know moe. I'm charging 100, 120, moe. On stone.

GARCIA: On stone, 'cause when we had them back then you were over there charging niggas 60 bucks for a pill, 50 bucks.

Freddy: Nah I was charging 80 moe, on stone. 80 bucks.

GARCIA: That's still too much love moe.

Freddy: On stone, but they were buying a whole like 5, 6 of them moe, on stone.

GARCIA: On stone, I'm saying now, on stone. On stone, if you don't buy 5... 5 or more, they're all 100. On stone, 100. On stone, and you could hit 'em with the "On stone, I sell these for 120. I'm giving these to you for 100. That's a deal."
You could, you could go and flip them for 120. On stone.

Freddy: On stone, right moe?

GARCIA: 100 moe. Don't... Nothing. If, if it's not 5 or more, on stone. On stone. Now if they ask for like, 10, you know, give it to 'em for 90 bucks. You know? On stone. If they get, if they get 20 or more, then, like, 85 bucks. On stone.
That's... 80's the lowest you could go though, but that's only bulk.

Freddy: On stone moe. I'm telling you moe. "Man, I just came out of jail, I'm good now." She's like, "Okay, call you in 2 weeks. I'll have them ready for you." "Alright bet."

GARCIA: On stone moe, she's gon' have like 200 pills for you.

Freddy: Damn, boy.

GARCIA: On stone, Tiny had a whole Walmart bag full of them bitches.

Freddy: [U/I] all tabs moe. Imagine 20 tabs moe. 10 each in there.

GARCIA: On stone, moe. Yeah it's, it's 10 each in there. Every tablet thing.

Freddy: Damn, on stone. [U/I] I'm just saying.

GARCIA: On stone moe. What you call... Moe has [U/I], Moe has bought like... 3, 4 bands of that shit, worth of yercs.

Freddy: Damn.

GARCIA: 4 bands worth of yercs. A whole bag full.

Freddy: That's what I'mma hit her with too, moe. I'm like "Here. Boom."

GARCIA: On stone moe. On stone. Whatever you give her, you gonna, you gonna quadruple that. On stone. You're quadrupling that shit.

Freddy: I know. But on stone, she told me dog, she, the prices went up, moe. On stone though. I ain't gon' lie. She did.

GARCIA: She probably gonna up 'em probably like 10 more bucks.

Freddy: On stone. She's all like "Nah," she said that the 60s are 35 and the 30s are 20.

GARCIA: Oh, that's love! Check it out!

Freddy: Right? That's what I'm saying. Like, come on. Check it out. On stone.

GARCIA: That ain't shit to us. On stone. That ain't shit to us.

Freddy: You feel me? 35 bucks and 20? Perfect.

| GARCIA: | On stone, I knew she, I knew she was gonna up it 10 bucks. On stone. |
| Freddy: | Mhm. Exactly. So I'm like "Yeah, come on." |
| GARCIA: | And you could still [PH] from that, just be like "Man, look. I got 4,000 even for you to hook me up." She gon' go. On stone. That's how Tiny was doing it. |
| Freddy: | Damn. I'm doing that shit too. Fuck it. |
| GARCIA: | Yeah, like, on stone. Hit her with the... Like man, you know? "I need this bitch." You know, on stone. She gon'... Stone, that lady cool as hell. |
| Freddy: | I'mma hit her with that, moe. I be like "Here. 4 G. Boom. What you got?" |
| GARCIA: | On stone. She gon' give you like, probably like 400 pills, moe. |
| Freddy: | Stone. I heard the voicemail, right? 'Cause I have Tiny's phone. |

## II.  GUIDELINES CALCULATIONS

The government agrees with the Probation Office's calculation of the advisory Guidelines range. According to his sentencing memorandum, defendant does not object to any aspect of the PSR. R. 442 at 6.

### A.  Offense Level

#### 1.  Base Offense Level

The base offense level is 30, pursuant to Guideline §§ 2D1.1(a)(5) and (c)(5), because the amount of converted drug weight involved in the offense is 1072.36 kilograms, which is more than 1,000 kilograms, but less than 3,000 kilograms, of converted drug weight. PSR ¶ 22.

#### 2.  Possession of Dangerous Weapon

The base offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(1), because defendant possessed a dangerous weapon, specifically the apparent firearm that defendant possessed during the January 21, 2022 distribution described above. PSR ¶ 23.

16

### 3. Acceptance of Responsibility

Based on the facts now known to the government, defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct within the meaning of Guideline § 3E1.1(a). If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), a two-level reduction in the offense level will be appropriate.

In accord with Guideline § 3E1.1(b), defendant timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-point reduction in the offense level.

### B. Criminal History Category

Based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

### C. Anticipated Advisory Sentencing Guidelines Range

Based on the facts now known to the government, the anticipated offense level is 29 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 87 to 108 months' imprisonment, in addition to any supervised release and fine the Court may impose.

17

### III.   GOVERNMENT'S RECOMMENDATION

Pursuant to the plea agreement in this case and Department of Justice policy that supports eliminating powder-to-crack sentencing disparities, the government recommends that the Court impose a term of imprisonment between 30 and 37 months. The Sentencing Guidelines Manual currently in effect, namely, the November 2023 Guidelines Manual, contains a powder-to-crack cocaine disparity. The Department of Justice supports eliminating the powder-to-crack sentencing disparity, and the government will therefore advocate for a sentence consistent with the Guidelines for powder cocaine rather than crack cocaine at sentencing. The Court may, consistent with the law and current sentencing framework, consider whether the powder-to-crack disparity is warranted in assessing the section 3553(a) factors at sentencing.

If crack cocaine were treated as powder cocaine under the Sentencing Guidelines Manual currently in effect, then (1) the base offense level would be level 20, pursuant to Guideline § 2D1.1(c)(10), because 303.3 grams of cocaine and .4 grams of heroin is equivalent to approximately 61 kilograms of converted drug weight, which is at least 60 kilograms but less than 80 kilograms of converted drug weight;. The government anticipates recommending a below-Guidelines sentence within that range; (2) the total offense level would be 22; and (3) the Sentencing Guidelines range, after the reduction for acceptance of responsibility and timely plea would be 30 to 37 months' imprisonment, based on a total offense level of 19 and criminal history category of I, in addition to any supervised release and fine the Court may impose.

18

**IV. THE SECTION 3553(a) FACTORS SUPPORT THE GOVERNMENT'S RECOMMENDED BELOW-GUIDELINES SENTENCE**

The advisory Guidelines range is the starting point and initial benchmark for determining the appropriate sentence for a defendant. *United States v. McLaughlin*, 760 F.3d 699, 708 (7th Cir. 2014). As explained below, a below-Guidelines term of imprisonment within the 30 to 37 month range is sufficient, but not greater than necessary, to satisfy the statutory sentencing objectives.

**A. The Nature and Circumstances of Offense**

Defendant conspired with others to distribute crack cocaine, cocaine, and heroin to customers in the Chicago area. Distribution of narcotics appears to have been defendant's full time occupation and sole or primary source of income. In distributing narcotics, defendant contributed to a drug trade that causes significant harm to individuals, communities, and countries. While defendant is not solely responsible for those harms, his actions contributed to sustaining the drug trade, which could not exist without individuals like defendant.

In choosing to take those actions, defendant contributed to the endangerment of others, including the end users of the poison peddled by the drug trade. Those users often become unproductive members of society who prey upon others to satisfy their addictions. Drugs ruin not only their lives, but the lives of their family members as well. And the ripple effects go even further: illicit drug use harms communities and imposes significant burdens (for example, addressing associated healthcare needs and crime) on the United States, as well as countries abroad.

Conspiring to distribute crack cocaine and cocaine is serious criminal conduct. But defendant's criminal conduct is even more serious because it involved the possession of firearms by defendant and co-conspirators. As the Seventh Circuit has observed, "[o]nce the gun is in the defendant's hands he need only pull the trigger, an act which can be completed in a split second and which is controlled and influenced by nothing more than the defendant's whim." *United States v. Mathews*, 520 F.3d 806, 809 (7th Cir. 2008) (citation omitted). The tragic culmination of those split-second decisions has contributed to the violence residents of this district have endured for years. That violence has destroyed lives and has created an environment of fear. Residents from all walks of life fear that either they or someone they know will be a victim of gun-related violence.

To be sure, defendant is not charged (in this case) with participating in acts of violence. But, as Congress has recognized, drugs and guns are a dangerous combination. *See, e.g, Smith v. United States*, 508 U.S. 223, 240 (1993) (recognizing the Congressional awareness that "that drugs and guns are a dangerous combination"). "The presence of guns . . . during a drug transaction may increase the likelihood of violence erupting in what are often already volatile situations." *United States v. Dickerson*, 705 F.3d 683, 689 (7th Cir. 2013). Though defendant has pled not guilty and the charges remain unproven, the murder charges pending against defendant in state court illustrate this potential for danger The seriousness of the possession of dangerous weapons is properly reflected in the criminal penalties

20

defendant is facing in this case. A sentence within the government's recommended range would properly recognize the seriousness of defendant's offense.

## B. History and Characteristics of Defendant

Defendant's background reflects both aggravating and mitigating facts. With respect to aggravation, it appears that defendant distributed narcotics as his sole source of income and primary occupation. Defendant admitted to the Probation Office that he supported himself by "selling drugs." PSR ¶ 74. It is aggravating that defendant dedicated himself to criminal pursuits at such a young age. Defendant is currently 20 years old and has been incarcerated since shortly after his 18th birthday. PSR ¶¶ 50, 58. He began to associate with La Familia Stones street gang at the age of 14, and the offense of conviction in this case is related to that association. PSR ¶ 57.

Turning to mitigation, defendant grew up in an environment to which no child deserves to be exposed. PSR ¶¶ 50-55. Defendant suffered physical abuse at the hands of his father and his mother's boyfriend. PSR ¶¶50, 53. He moved repeatedly with his mother and reported that he "wondered what he did wrong as a child not to have a dad that loved me.'" PSR ¶ 53. He reported being left alone frequently as a child, which led to his association with La Familia Stones when the gang provided him friendship and the ability to make money to support his mother. PSR ¶ 57. Defendant also has a history of substance abuse. Prior to his arrest, he was a daily user of marijuana and Percocet. PSR ¶ 69. Those factors are certainly mitigating and should be considered by the Court.

But they only go so far in explaining defendant's serious criminal activity. The unfortunate reality is that there are people in this district who grew up in rough

21

neighborhoods and struggle with substance abuse issues as adults. Those individuals do not, however, proceed to engage in serious criminal conduct as a matter of course. They, like defendant, retain the ability to distinguish between right and wrong. And defendant's repeated decision to choose wrong over right is what brings him before the Court for sentencing.

### C. Affording Adequate Deterrence

The sentence imposed in this case should aim to deter defendant from engaging in any further criminal activity. A significant term of imprisonment will demonstrate to defendant that distribution of narcotics will be met with serious consequences. Specific deterrence is an especially important consideration where, as here, defendant has not previously developed many of the skills and experience that will be necessary to live as a productive member of the community. Defendant faces a difficult path upon release, and the temptation to return to criminal conduct will be there. A significant sentence here will demonstrate to defendant that additional criminal conduct in the future will not be worth the cost.

So too is general deterrence an important consideration. The drug trade has a devastating impact on both the lives of drug users and on the public at large. And it thrives because of individuals like defendant who repeatedly choose to participate in the drug trade, often because of the false promise of easy money. The sentence imposed in this case should aim to deter others from seeking to profit from the pain created by the drug trade.

**V.    CONDITIONS OF SUPERVISED RELEASE**

The government agrees with the conditions of supervised release proposed by Probation, as well as its recommendation that defendant be sentenced to a four-year term of supervised release. Given defendant's history and characteristics, his offense conduct, and the purposes of sentencing as reflected in 18 U.S.C. §§ 3553 and 3583, the government requests that defendant be required to comply with the following conditions of supervised release.

**A.    Mandatory Conditions of Supervised Release**

The government agrees with Probation that the following conditions should be imposed because they are mandated by 18 U.S.C. § 3583(d) and Guidelines § 5D1.3(a):

1.    Defendant shall not commit another federal, state, or local crime.

2.    Defendant shall not unlawfully possess a controlled substance.

5.    Defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

6.    Defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.

**B.    Discretionary Conditions of Supervised Release**

The government agrees with Probation that the following discretionary conditions should be imposed because they support defendant's rehabilitation, help reduce his risk of recidivism, provide him with needed treatment, and will generally help him successfully reintegrate into society:

4. Defendant shall seek, and work conscientiously at, lawful employment or, if he is not gainfully employed, he shall pursue conscientiously a course of study or vocational training that will equip defendant for employment.

6. You shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not knowingly meet or communicate with the following persons: Eduart Hoxha, Alexis Del Toro, Bryan Del Toro, Alex Hernandez, Ruben Valencia, Karina Jimenez, Jonas Castillo, Bryan Del Toro, Kevin Ramirez, and Jesenia Calle

7. Defendant shall refrain from excessive use of alcohol, and from any use of a narcotic drug or other controlled substance, as defined in § 102 of the Controlled Substances Act, without a prescription by a licensed medical practitioner.

8. Defendant shall not possess a firearm, destructive device, or other dangerous weapon.

9. Defendant shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.

Additionally, the government agrees that the following conditions should be imposed as a part of any term of supervised release because they help Probation supervise defendant, which, in turn, encourages defendant's compliance with the law and deters him from committing future crimes:

14. Defendant shall not knowingly leave from the federal judicial district where defendant is being supervised, unless granted permission to leave by the court or a probation officer.

15. Defendant shall report to a probation officer in the federal judicial district to which he is released within 72 hours of release from imprisonment.

16. Defendant shall permit a probation officer to visit him at any reasonable time, including at home, at work, at school, at a community service location, and any other reasonable location specified by a probation officer. In addition, defendant shall permit confiscation of any contraband observed in plain view of the probation officer.

17. Defendant shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. Defendant shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

18. Defendant shall notify a probation officer within 72 hours after being arrested, charged with a crime, or questioned by a law enforcement officer.

21. Defendant shall be surrendered to a duly authorized official of the Department of Homeland Security for a determination on the issue of deportability by the appropriate authority in accordance with the law. If ordered deported, defendant shall not reenter the United States without obtaining, in advance, the express written consent of the Attorney General or the Secretary of Homeland Security.

22. Defendant shall satisfy such other special conditions as ordered below.

23. Defendant shall submit his person, property, house, residence, vehicle, papers, or office to a search conducted by a United States Probation Officer. An Officer may conduct a search pursuant to this condition only when reasonable suspicion exists that defendant has violated a condition of his supervision and that the areas to be searched contain evidence of the violation.

The record supports the imposition of both Condition 16 and Condition 23. The offense of conviction involved possession of narcotics and firearms in multiple locations, including defendant's home and vehicle. That contraband was sometimes in plain view—as defendant's firearm was during the January 21, 2022 transaction—and it sometimes was not. Additionally, the PSR reflects that defendant has largely not been engaged in gainful employment or education. Defendant's mobility and possession of contraband in multiple locations supports the imposition of Condition 16. Condition 16 will allow Probation to supervise defendant more effectively and deter him from future criminal conduct. Defendant's concealment of contraband within his home and vehicle support the imposition of Condition 23.

25

### D. Special Conditions of Supervised Release

The government agrees with Probation that the following special conditions should be imposed as a part of any term of supervised release because they support defendant's rehabilitation, abate his risk of recidivism, facilitate his repayment of buy money, and help him to successfully reintegrate into society:

3. Defendant shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. The amount of community service shall not exceed 400 hours.

5. Defendant shall not incur new credit charges or open additional lines of credit without the approval of a Probation Officer, unless in compliance with the financial obligations imposed by the Court's judgment.

6. Defendant shall provide a Probation Officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release.

7. Within 72 hours of any significant change in economic circumstances that might affect defendant's ability to pay restitution, fines, or special assessments, defendant must notify the Probation Officer of the change.

10. Defendant shall pay to the Clerk of Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of defendant's gross earnings minus federal and state income tax withholdings.

12. Defendant shall pay to the Clerk of Court $2,730 as repayment to the United States of government funds received during the investigation of this offense.

Lastly, the government agrees that the following special condition should be imposed because it assists Probation in monitoring defendant, and makes defendant less likely to recidivate:

11.    Defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

14.    Defendant shall observe one Reentry Court session, as instructed by his probation officer.

## VI.  CONCLUSION

For these reasons, the government recommends a below-Guidelines sentence, followed by a four-year term of supervised release. Defendant should also be ordered to pay a $100 mandatory special assessment.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    /s/ *Adam Rosenbloom*
ADAM ROSENBLOOM
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-0962

Dated: October 1, 2024